IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, JUDGE

Civil Case No.  10-cv-03005-LTB-KLM

EMC INSURANCE COMPANIES, an Iowa corporation,

            Plaintiff,

v.

MID-CONTINENT CASUALTY COMPANY, an Oklahoma corporation,

            Defendant.

_____

ORDER

_____

        This matter is before me on two motions.  The first is Plaintiff EMC Insurance Companies'

("EMC") Motion for Partial Summary Judgment **[Docs # 24, 25]**. The second is Defendant Mid-

Continent Casualty Company's ("Mid-Con") Cross-Motion for Summary Judgment **[Doc #29]**. After

considering the parties' arguments, for the reasons below, I GRANT both motions in part and DENY

them in part according to the instructions below.

## I. Background

        This is an insurance coverage, contribution, and indemnification action between insurers

stemming from an underlying construction and design defect case that settled.  EMC and Mid-Con

are insurance companies. Only a general presentation of the facts is necessary here, as more specifics

will be discussed below.

        In 2000, Hans Nielsen Inc. ("HNI"), hired an architect to evaluate the possibility of a 51-unit

condominium project in Denver, Colorado (the "Project"). HNI was the named insured of a

commercial general liability insurance policy issued by EMC (the "EMC Policy"). The policy was

effective from November 28, 2002, to November 28, 2003, and it did not contain any additional insured endorsements apposite here. Nanna Nielsen Smith ("Smith"), was an officer of HNI.

With the design underway, BVPC, LLC ("BVPC"), was created in 2001 as a special purpose entity to develop and construct the Project. BVPC is not owned by HNI, nor is HNI a member or manager of BVPC.  Smith, however, served as BVPC's manager during the pertinent time periods.

In 2002, BVPC entered into a construction contract with N.J. Orr Construction Company ("Orr") for Orr to be the Project's general contractor.  Orr was the "Named Insured" in a commercial general liability insurance policy Mid-Con issued (the "Mid-Con Policy").  The policy's effective dates were August 15, 2002, to January 1, 2004. The parties agree that BVPC and HNI are additional insureds under the Mid-Con policy via two endorsements.

Then, in 2003, the homeowner's association for the Project was created (the "Association"), with the Project's declarations recorded in September of that year. BVPC was the Association's original declarant. BVPC was the entity that owned and sold the Project's units to individual purchasers. It began selling units prior to February 2004, at which time the Project's certificate of substantial completion was issued.

In January 2008, the Association filed suit against Smith, HNI, BVPC, Orr, and others, alleging a host of construction and design defect claims (the "Underlying Litigation"). Pursuant to the EMC Policy, EMC provided a defense for HNI and Smith and hired the law firm of Lambdin & Chaney to defend them. After requests from EMC, Mid-Con agreed to defend HNI and BVPC under a reservation of rights and hired the law firm of McConaughy and Sarkissian, PC, to defend them.  A reservation of rights enables an insurer to assert future defenses based on noncoverage under the policy. *See Signature Dev. Companies, Inc. v. Royal Ins. Co. of America*, 230 F.3d 1215,

1217 (10th Cir. 2000).  Mid-Con refused to provide any defense for Smith.

On May 19, 2009, the retained two law firms, Smith and her personal counsel, EMC, Mid-Con, and BVPC met to address the arrangement of their defenses. There, McConaughy and Sarkissian, PC, the firm retained by Mid-Con, was appointed to represent HNI and BVPC, but the parties agreed that the firm's primary responsibility was to defend BVPC.  Lambdin & Chaney, the firm retained by EMC, was appointed to represent HNI and Smith, and the parties agreed that the firm would be primarily responsible for representing HNI and Smith. The Underlying Litigation settled prior to trial. The terms of that settlement are not before me.

Displeased with Mid-Con's defense of HNI and its refusal to defend Smith in the Underlying Litigation, EMC filed this action.  EMC alleges, *inter alia*, that it paid the entire portion of the settlement that released and dismissed HNI and Smith from the Underlying Litigation and that it paid 100 percent of their defense costs. EMC also alleges that Mid-Con failed to provide a defense for Smith and an adequate defense for HNI. EMC claims that the Mid-Con and EMC Policies, together, required Mid-Con to defend Smith and HNI, to contribute to the costs of their defenses and to the settlement on their behalf, and to indemnify EMC for these costs. EMC asserts six claims here: (1) equitable subrogation; (2) equitable contribution; (3) declaratory judgment; (4) unjust enrichment; (5) estoppel; and (6) indemnity. These motions followed.

## II. Standard of Review

I begin by setting forth the appropriate standard of review, as well as general principles for interpreting insurance policies. The parties each move pursuant to Fed. R. Civ. P. 56. That rule allows a party to "move for summary judgment, identifying each claim or defense--on which summary judgment is sought."  Summary judgement per Rule 56 "is appropriate 'if the movant

shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.' " *Klen v. City of Loveland, Co.*, 661 F.3d 498, 508 (10th Cir. 2011) (quoting Fed. R. Civ. P. 56(a)).   Under this standard, the court must view the evidence and draw all reasonable inferences therefrom in the light most favorable to the nonmoving party.   *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1124 (10th Cir. 2005).   A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."   *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).   An issue is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."   *Id.* (citing *Anderson*, 477 U.S. at 248).

Where, as here, federal jurisdiction is predicated upon diversity, the court applies the substantive law of the forum state.   *Barrett v. Tallon*, 30 F.3d 1296, 1300 (10th Cir. 1994).   Under Colorado law, the interpretation of insurance policies, like other contracts, present questions of law and are therefore appropriate for summary judgment. *Thompson v. Maryland Cas. Co.*, 84 P.3d 496, 501 (Colo. 2004). When interpreting an insurance contract, I try to carry out the parties' intent and reasonable expectations when they drafted the policies.   *Id.*   I therefore seek to give the words in a policy their plain and ordinary meaning unless the intent of the parties indicates otherwise. *Id.* Additionally, I read the provisions of an insurance policy as a whole rather than in isolation.   *Fire Ins. Exch. v. Sullivan*, 224 P.3d 348, 351 (Colo. App. 2009).   I accordingly construe a policy so as to harmonize all provisions and render none meaningless.   *Progressive Speciality Ins. Co. v. Hartford Underwriters Ins. Co.*, 148 P.3d 470, 474 (Colo. App. 2006).   Where a term in an insurance policy is ambiguous, meaning it is susceptible to more than one reasonable interpretation, I construe the term against the drafter and in favor of providing coverage to the insured.   *Sachs v. American*

4

*Family Mut. Ins. Co.*, 251 P.3d 543, 546 (Colo. App. 2010). Mere disagreement of the parties, however, does not establish ambiguity. *Nat'l Cas. Co. v. Great Southwest Fire Ins. Co.*, 833 P.2d 741, 746 (Colo. 1992). Nevertheless, I may "neither add provisions to extend coverage beyond that contracted for, nor delete them to limit coverage." *Sachs*, 251 P.3d at 546.

### III. Discussion

EMC's motion requests summary judgment as to its declaratory judgment claim. That claim seeks the following declarations: (1) Mid-Con breached its duty to defend HNI and Smith; (2) the Mid-Con Policy's coverage to HNI and Smith was primary, and the EMC Policy's coverage was excess; and (3) Mid-Con owes indemnity to HNI and Smith for their cost to settle the Underlying Litigation. Mid-Con's response argues that for numerous independent reasons neither Smith nor HNI were covered under its policy, and therefore Mid-Con had no duty to defend or indemnify them. It further argues that while no duty to defend existed, the defense it provided HNI was nevertheless sufficient. Mid-Con lastly concludes that because its policy covered neither HNI nor Smith in the Underlying Litigation, the primary versus excess coverage issue is moot.

Mid-Con's cross-motion for summary judgment tracks its response to EMC's motion nearly verbatim and was filed just one day later. *Compare* Def.'s Resp. Doc. # 28, *with* Def.'s Mot. Doc #29. The motion simply adds that because Mid-Con had no duty to defend or indemnify, it follows that all of EMC's claims fail as a matter of law. EMC's response to Mid-Con's motion was filed contemporaneously with its reply, and it incorporates all the arguments marshaled therein, but it also argues that even if there was no coverage, some of its remaining claims still stand. Thus, with the exception of how a determination of no coverage for HNI and Smith under the Mid-Con Policy affects EMC's remaining claims, which is addressed only in Mid-Con's motion, the two motions

dispute the same issues: (1) whether Mid-Con had a duty to defend Smith or HNI; (2) whether Mid-Con had a duty to indemnify Smith or HNI; and (3) whether the Mid-Con Policy afforded the primary coverage for Smith or HNI. While both motions focus on these issues, they do so for different reasons. EMC seeks their declaration for their own sake. By contrast, Mid-Con's motion uses those issues as the basis for its argument, contending that it is entitled to summary judgment *because* it had no duty to defend or indemnify.

For brevity, clarity, and deciding only those issues that I must, I examine the three enumerated issues first, in Parts III.A-C. To do so, because of the two motions' timing and overlap, I consider the arguments pertaining to those issues in both sets of briefs. I then turn exclusively to Mid-Con's motion in Part III.D and consider it in the context of my preceding rulings.

### A. Whether Mid-Con Breached its Duty to Defend Smith or HNI

EMC contends that Mid-Con breached its duty to defend HNI and Smith. Unwrapping and deciding this issue requires determining first whether Mid-Con even had a duty to defend Smith or HNI. If it did, I must then decide whether Mid-Con discharged that duty.

### 1. Duty to Defend

An insurer's "duty to defend pertains to the insurance company's duty to affirmatively defend its insured against pending claims." *Constitution Assoc. v. New Hampshire Ins. Co.*, 930 P.2d 556, 563 (Colo. 1996). This should not be confused with the duty to indemnify, "which relates to the company's duty to satisfy a judgment entered against the insured." *Id.* The Colorado Supreme Court has explained the relationship between the two duties in the following way:

> The duty to defend is triggered more easily than is the duty to indemnify. Generally, the duty to defend arises where the alleged facts even *potentially* fall within the scope of coverage, but the duty to indemnify does not arise unless the policy *actually* covers the alleged harm. Where there is no duty to defend, it follows that there can

be no duty to indemnify. However, where there is a duty to defend, there is not necessarily a duty to indemnify.

*Id.* (internal citations omitted).

When an insurer refuses to defend its insured, determining whether the insurer had a duty to defend "is based *solely* on factual allegations contained in the underlying complaint." *Cotter Corp. v. American Empire Surplus Lines Ins. Co.*, 90 P.3d 814, 827 (Colo. 2004)(emphases added); *accord Thompson*, 84 P.3d at 502; *Cyprus Amax Minerals Co. v. Lexington Ins. Co.*, 74 P.3d 294, 299 (Colo. 2003); *Compass Ins. Co. v. City of Littleton*, 984 P.2d 606, 613 (Colo. 1999); *Constitution*, 930 P.2d at 563. "An insurer looks to the four corners of the complaint, together with the policy, to determine its right and duty to defend." *Bainbridge, Inc. v. Travelers Cas. Co. of Conn.*, 159 P.3d 748, 750 (Colo. App. 2006); *accord United Fire & Cas. Co. v. Boulder Plaza Residential*, 633 F.3d 951, 960 (10th Cir. 2011) ("As a general rule under Colorado law, an insurer's duty to defend an insured is triggered solely on the basis of the allegations made within the four corners of the complaint, read against the insurance policy.").

"An insurer has a duty to defend where a complaint against its insured alleges any facts that might fall within the coverage of the policy, even if allegations only potentially or arguably fall within the policy's coverage." *Thompson*, 84 P.3d at 496 (internal quotations omitted); *accord Cotter*, 90 P.3d at 827 ("A duty to defend exists when a complaint includes any allegations that, if sustained, would impose a liability covered by the policy.") (internal quotations omitted); *Hecla Min. Co. v. New Hampshire Ins. Co.*, 811 P.2d 1083 (Colo. 1991) ("The actual liability of the insured to the claimant is not the criterion which places upon the insurance company the obligation to defend. Rather, the obligation to defend arises from allegations in the complaint, which if sustained, would impose a liability covered by the policy.") (internal quotations and citation

7

omitted). Where an insurer refused to defend an insured, this is the standard used for determining the insurer's duty to defend both before and after the completion of the underlying litigation. *Cotter*, 90 P.3d at 827. "When all the elements of a claim covered by a policy are alleged, an insurer has a duty to defend its insured, even if a claim is not labeled according to the terms used in an insurance policy." *Thompson*, 84 P.3d at 502.  Conversely, if the underlying complaint fails to allege facts satisfying one of the elements of a claim covered in an insurance policy, an insurer has no duty to defend against that claim.  *Id.*

In *Hecla*, the Colorado Supreme Court noted a circumstance in which a court may rely on facts outside of the underlying complaint to determine an insurer's obligation to defend. 811 P.2d 1083. The court stated that when an insurer believes its has no obligation to defend an insured, the insurer should agree to defend the insured but reserve its rights either to seek reimbursement should the facts at trial prove that the incident resulting in liability was not covered by the policy or to file a declaratory judgment action after the underlying case has been adjudicated.  *Id.* at 1089. "Therefore, [the court] allowed insurers that provide a defense to rely on facts outside of the complaint to determine whether they could recover the costs of defense from the insured." *Cotter*, 90 P.3d at 827.

To be sure, *Hecla* "did not modify the general determination of the duty to defend, but instead merely attempted to create a remedy for insurers that provided defenses to insureds when coverage ultimately did not exist." *Cotter*, 90 P.3d at 827.  *Cotter* affirmed that "when an insurer refuses to defend and the insured brings an action for defense costs after the underlying litigation has been resolved, [I] apply the general rule that the duty to defend is determined from the factual allegations contained in the complaint." *Id.*

8

I now apply these principles to examine whether Mid-Con had a duty to defend Smith or HNI in the Underlying Litigation.

### a. Smith

EMC argues that Mid-Con had a duty to defend Smith in the Underlying Litigation because she qualified as an "Insured" per the terms of the Mid-Con Policy based on the allegations in the complaint from the Underlying Litigation. Mid-Con counters that none of those allegations, even if true, would trigger a duty to defend because none of them make Smith an "Insured," and it only has a duty to defend "Insureds."  For the reasons below, I agree with Mid-Con.

Because Mid-Con refused to defend Smith in the Underlying Litigation, the general analysis from *Cotter* applies. *See* 90 P.3d at 829. I therefore look only to the factual allegations in the underlying complaint and read them against the Mid-Con Policy to see whether they triggered coverage.  *Cyprus*, 74 P.3d at 299; *United Fire*, 633 F.3d at 960. EMC cites three types of allegations from the underlying complaint in support of its contention that Smith was an "Insured" under the Mid-Con Policy: Smith was an officer of HNI; she was the manager of BVPC; and she was BVPC's real estate manager.

Turning to the policy, section II prescribes "Who is an Insured." It provides the following in pertinent part:

1. If *you* are designated in the Declarations as:

> c. A limited liability company, *you* are an Insured. *Your* members are also Insureds, but only with respect to the conduct of *your* business. *Your* managers are Insureds, but only with respect to their duties as *your* managers.

> d. An organization other than a partnership, joint venture or limited liability company, *you* are an Insured. *Your* "executive officers" and directors are Insureds, but only with respect to their duties as *your* officers or directors.

9

2. Each of the following is also an Insured:

> b. Any person (other than your "employee" or "volunteer worker"), or any organization while acting as *your* real estate manager.

Pl.'s Mot. Ex A-1 (the "Mid-Con Policy"), § II.1, 2. at 15 (emphases added) (the page numbers cited correspond with the pagination of EMC's Exhibit A, Doc #25-2). The first page of the Mid-Con policy clearly and unambiguously states that "[t]hroughout this policy, the words 'you' and 'your' refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under th[e] policy." Mid-Con Policy at 7. Thus, in order for a manager of a limited liability company or an officer or director of a corporation to be an "Insured," the entity for which she serves in that role must be the "Named Insured" as shown in the Declarations, or must qualify as a "Named Insured" under the policy.

Turning to the Declarations, it prescribes that "[t]he Named Insured for this policy is: N.J. Orr Construction, LLC; Orr Structures, Inc.; Orr Property Management, Inc." *Id.* at 6. No other entity is listed. This is important. "Because the identification of the named insured is of paramount interest to the insurer, in interpreting insurance policies, courts have held that the term 'named insured' has a restricted meaning and does not apply to any persons other than those named in the policy." *D.C. Concrete Mgmt., Inc. v. Mid-Century Ins.*, 39 P.3d 1205, 1207 (Colo. App. 2001). Additionally, no other provision in the policy, nor any other endorsement or amendment, speaks to qualifying as a "Named Insured" or adds a "Named Insured." *See* Mid-Con Policy.

EMC nevertheless submits that Smith is an "Insured" under section II.1 because HNI qualifies as a "Named Insured," meaning that "you" and "your" as used in section II (and throughout the policy) refers not only to Orr, but also to HNI. EMC relies on two independent provisions from the Mid-Con Policy in support. The first is the endorsement that made HNI an additional insured

10

under the policy, endorsement ML 10 81 (03 01) ("AIE 10 81").  *See* Mid-Con Policy at 24. "An insurance policy and an endorsement attached to it must be considered as a single instrument, and they should be construed together in the absence of an internal conflict which cannot be reconciled." *Martinez v. Hawkeye-Sec. Ins. Co.*, 576 P.2d 1017, 1019 (Colo. 1978). And, "[b]eing the last expression of intent" the endorsement "prevails if the language of the two conflict." *Id.* AIE 10 81 provides the following:

SCHEDULE

Name of Person or Organization:

Any person or organization for whom the named insured has agreed by written "insured contract" to designate as an additional insured subject to all provisions and limitations of the policy.

(if no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

WHO IS AN INSURED (Section II) is amended to include as an insured the person or organization shown in the Schedule, but only with respect to liability directly attributable to your performance of ongoing operations for that Insured.

*Id.*  EMC argues that because this endorsement does not list an "entity"–that is, HNI–the Declarations were required to include HNI as the insured, making HNI a "Named Insured" and thereby fitting the definition of "you." Pl.'s Mot. at 21.

This argument is untenable under a plain reading of the endorsement and the policy. The parenthetical language does not say "entity" as EMC quotes; it says "entry," and the endorsement clearly has an entry: the sentence beginning with "[a]ny." Instead of having to amend the policy each time Orr entered into an "insured contract," the policy was amended to include a general, blanket provision into which HNI fell.  Furthermore, the last sentence of the endorsement does not deem an applicable organization a "Named Insured," the status required for "you" and "your" as they are used

11

in the policy to apply. Rather, the endorsement transforms the applicable entity or person into an

"Insured."  Indeed, the title and text of the endorsement refer to "additional insured coverage"–not

additional "Named Insured" coverage. It is significant when an insurance policy identifies and

distinguishes between a named insured vis-a-vis just an "insured," and a party that becomes an

additional insured does not become a "named insured." *See, e.g.*, *United Fire*, 633 F.3d at 962

(construing provisions similar to the definition of "you" and "your" and AI Endorsement 10 81);

*Weitz Co., LLC v. Mid-Century Ins. Co.*, 181 P.3d 309 (Colo. App. 2007) (construing an additional

insured endorsement nearly identical to AIE 10 81 and concluding that "you" and "your" therein

referred to the named insured, not the additional insured).  This is a crucial point because only the

officers and directors of a "Named Insured" are considered "Insureds" under the policy.  *See* Mid-

Con Policy § II at 15.

EMC's interpretation also renders the endorsement senseless. Adopting it, the last sentence

of the endorsement would read as follows: "WHO IS AN INSURED (Section II) is amended to

include as an insured the person or organization shown in the Schedule, but only with respect to

liability directly attributable to [HNI's] performance of ongoing operations for [HNI]."  This cannot

be what the parties intended. Thus, AIE 10 81 did not transmute HNI into a "Named Insured," and

therefore it did not make Smith an "Insured."

EMC's second argument for why HNI was a "Named Insured" rests on section IV.7 of the

Mid-Con Policy, the "Separation of Insureds" provision:

7. Separation of Insureds

Except with respect to the Limit of Insurance, and any rights or duties specifically
assigned in this Coverage Part to the first Named Insured, this Insurance applies:

a. As if each Named Insured were the only Named Insured; and

b. Separately to each Insured against whom claim is made or "suit" is brought.

Mid-Con Policy § IV.7, at 18.  EMC contends that this clause makes the Mid-Con Policy's coverage of Named Insured and Insured equal.  Stated differently, EMC argues that this clause effectively conflates Insureds and Named Insureds.  As a result, EMC concludes, HNI and BVPC are "Named Insureds," which means that Smith is also an Insured under section II.1 because she was the manager of BVPC and an officer and director of HNI.

This interpretation is discordant with the provisions plain language.  The introductory language to section IV.b explicitly and unambiguously re-delineates the important distinction between the first Named Insured, Orr, and the Insureds.  *See First Fin. Ins. Co. v. Albertson's, Inc.* 91 P.3d 470, 473 (Colo. App. 2004) (rights assigned to the first named insured are not subject to the separation of insureds provision.).  The provision clearly requires separate and equal treatment of insureds having the same level of coverage–not separate and equal treatment of all the insureds.  To adopt EMC's reading would obliterate the plain language of the provision and render the stark distinction the policy draws between Named Insured and Insured meaningless. *See Thompson*, 84 P.3d at 501; *Progressive*, 148 P.3d at 474.  Hence, I decline to do so.

EMC's third argument is an outgrowth of the first two.  EMC cites allegations from the complaint in the Underlying Litigation, and avers its own, that Smith was BVPC's real estate manager.  EMC asserts that under section II.2.b, quoted above, this makes Smith an Insured. *See* Mid-Con Policy, § II.2.b at 15. Like its previous arguments, this is faulty because it is predicated upon a distorted reading of the policy.  It requires reading "you" and "your" to mean BVPC, but, as explained, those terms refer only to the Named Insured, which is Orr. It also necessitates reading the separation of insureds clause, section IV.7, in a way inconsistent with applicable law and the

13

policy's plain meaning.

EMC alternatively argues that Smith was *Orr's* real estate manager under two different theories. First, HNI was the real estate manager for BVPC, and while Orr's construction contract was with BVPC, Orr nevertheless responded to certain demands Smith made.   Thus, EMC concludes, any work Orr performed directly for HNI through Smith's direction reflects that Orr was serving at Smith's behest.   In support of this contention, EMC relies exclusively on extrinsic evidence, yet my inquiry is confined to the four corners of the underlying complaint.  I see nothing therein that supports the argument that Smith acted as Orr's real estate manager.   Second, EMC asserts that the manager of Orr was a member of BVPC and was a "Named Insured" under the Mid-Con Policy. EMC argues that, as a result, when Smith was acting as real estate manager for BVPC, they were acting as real estate manager for Orr's manager both in his capacities as member of BVPC and as  officer of Orr.  This argument is riddled with alarming infirmities.  Orr's manager is not a "Named Insured" under the Mid-Con Policy.  *See* Mid-Con Policy Declarations at 6.  It also flies in the face of basic business law tenets that a limited liability company like BVPC is its own legal entity such that its employees work for BVPC, not for its members. Assuming I were to completely abandon that fundamental business law precept, EMC fails to explain or cite legal authority in support of its novel theory that working for Orr's manager as he sat in his BVPC-member chair also served to make Smith an employee of every organization for which the manager was an officer, director, or member.   Needless to say I reject both strands of this argument. I therefore conclude Smith was not an "Insured" under section II.2.b.

Lastly, EMC argues that Smith was an "Insured" under the Mid-Con Policy per its "Insured Contract" exception to the exclusion for contractual liability. Mid-Con Policy § I.2.b at 8.  EMC's

14

reliance on this provision proves specious. This is because Smith is not otherwise an "insured" under

the policy. As the Tenth Circuit explained when examining Colorado law,

> [e]xclusions play an important rule in [commercial general liability policies]. Structurally, [such a] policy "begin[s] with a broad grant of coverage, which is then limited in scope by exclusion. Exceptions to exclusions narrow the scope of the exclusion and, as a consequence, add back coverage. *But it is the initial broad grant of coverage, not the exception to the exclusion, that ultimately creates (or does not create) the coverage sought.*"

*Greystone Construction, Inc. v. National Fire & Marine Ins. Co.*, 661 F.3d 1272, 1289 (10th Cir.

2011) (emphasis added) (citing David Dekker et al., *The Expansion of Insurance Coverage for*

*Defective Construction*, 28 Constr. Law., Fall 2008, at 19-20). The allegations in the underlying

complaint, read against the Mid-Con policy, do not show that Smith may have been an "Insured"

to which the initial broad grant of coverage was even applicable.

Accordingly, I conclude that EMC fails to point me to allegations in the underlying

complaint that Smith "might" be an "Insured" under the terms of the Mid-Con Policy, *see Hecla*,

811 P.2d at 1089, nor do I find any on my own review.  Because Smith must be an "Insured" to be

covered by the policy, EMC therefore fails to show that Mid-Con had a duty to defend Smith.  *See*

Mid-Con Policy, § I Coverage A ¶ 1(a), at 7, and Coverage B ¶ 1(a), at 11 ("We will pay those sums

*that the insured* becomes legally obligated to pay . . . .") (emphasis added); *see also Thomson*, 84

P.3d at 502 ("[I]f an underlying complaint fails to allege facts satisfying one of the elements of a

claim covered in an insurance policy, an insurer has no duty to defend against that claim."). I

therefore deny this portion of EMC's motion.

### b. HNI

EMC also asserts that Mid-Con had a duty to defend HNI as an additional insured under the

Mid-Con Policy. Mid-Con agrees that HNI was an additional insured but argues no duty to defend

existed because of numerous independent provisions in the policy limiting or excluding coverage.

There are two matters I must address preliminarily.  I firstly clarify that contrary to EMC's repeated assertions, Mid-Con never admitted that it "owed" HNI a defense. *See* Pl.'s Mot. at 18 ("Mid-Continent repeatedly conceded that it owed a defense to HNI . . . ."). In all of the documents that EMC references in support of that assertion, Mid-Con stated it "accepted a defense" or "agreed to defend" HNI, "subject to a reservation of rights." *See, e.g.*, Pl.'s Mot. Ex C at 12 ("[Mid-Con] *agrees to provide* . . . [HNI] a defense in this matter.") (emphasis added), Ex. E (same).

The second preliminary matter is that the parties cursorily dispute what I can consider when determining whether a duty to defend existed here. EMC contends it is only the "four-corners" of the underlying complaint, as stated in *Cotter*, but Mid-Con asserts that I can also consider extrinsic evidence as permitted in *Hecla*–specifically an affidavit and sworn discovery responses from Smith. Which rule applies matters because in arguing whether Mid-Con had a duty to defend, both parties rely in part on allegations in EMC's complaint in *this* action, as well as other evidence submitted in *this* case.  Depending on the rule, I may or may not consider extrinsic evidence. Which rule applies also matters because the Colorado Supreme Court has admonished lower courts that have "collapse[d] the determinations of the duty to defend and the duty to indemnify" by considering evidence beyond the allegations in the underlying complaint to decide whether there was a duty to defend.  *See, e.g.*, *Cotter*, 90 P.3d at 827-28.

Resolving this dispute is more complicated than it seems at first glance because of this case's very peculiar posture.  *Cotter*'s general rule applies "when an insurer *refuses to defend* and the insured brings an action for defense costs after the underlying litigation has been resolved."  *Id.* at 828 (emphasis added). On one hand, this case fits within *Cotter* because EMC–standing in the

insured's shoes–is bringing the action. On the other hand, unlike the insured in *Cotter*, Mid-Con did

not refuse to defend HNI. This seems to weigh against *Cotter* and in favor of *Hecla*'s rule.

*Hecla* contemplates that the insurer defended the insured in the underlying matter with a

reservation of rights, and then brings an action seeking reimbursement after the facts at trial proved

that the incident resulting in liability was not covered by the policy or files a declaratory judgment

action after the underlying case has been adjudicated.  The first variable is present here: Mid-Con

agreed to defend HNI subject to a reservation of rights.  The second variable, however, is not: Mid-

Con neither commenced this case, nor does it not seek reimbursement for the costs it incurred in

defending HNI.  Moreover, the Underlying Litigation was not fully adjudicated or tried; it settled.

I further note that neither party cites, nor is the Court aware of, any case factually and procedurally

congruent with the one here that would instruct me as to whether I may, in this unique circumstance,

consider facts outside the underlying complaint. For these reasons the instant case sits

uncomfortably in both *Cotter*'s and *Hecla*'s chair.

I conclude that hewing to the four-corners rule from *Cotter* is the more appropriate course.

I rely on a portion of *Cotter* that stated the following:

> In, *Hecla*, we did *not* attempt to shift the basis for determining the duty to defend upon conclusion of the underlying litigation from the complaint alone to facts outside the complaint. Rather, in *Hecla*, we addressed a specific situation in which an insurer 'believes it is under no obligation to defend.' We allowed insurers in such a situation to seek reimbursement for defense costs if coverage *ultimately did not exist* under the policies. Additionally, we created an incentive for insurers to defend by allowing them to subsequently seek reimbursement.  Thus, we did *not* modify the general determination of the duty to defend, but instead merely attempted to create a remedy for insurers that provided defenses to insureds when coverage ultimately did not exist."

*Id.* at 828 (emphases added and internal citations omitted).

Mid-Con has not shown that the Underlying Litigation determined that coverage for HNI

under the Mid-Con Policy "ultimately did not exist," the predicate for looking beyond the underlying complaint to determine whether a duty to defend existed. *See Cotter, supra*. Stated differently, *Hecla* and *Cotter* posit that in order to consider facts beyond the underlying complaint to determine an insurer's duty to defend, the underlying action needs to have been adjudicated or tried and needs to have decided that the policy did not cover HNI. *See id.* ("We explained that such an insurer should defend but reserve its rights either 'to seek reimbursement *should the facts at trial prove that the incident resulting in liability was not covered by the policy,* or to file a declaratory judgment action *after the underlying case has been adjudicated*.") (emphases added) (citing *Hecla*, 811 P.2d at 1089). Nothing before me shows that occurred. Nor does the record contain the terms of the underlying settlement which may have contained a stipulation or admission apposite to this point. By asking me to consider facts beyond the complaint, Mid-Con is seeking to circumvent this requirement.

Concluding that I may look beyond the allegations in the underlying complaint here would also create an exception to the general four-corners rule that would swallow that rule altogether–for if a court were allowed to look beyond the allegations in an underlying complaint *absent* a prior determination or agreement that the incident at issue was not covered, a court could *always* look beyond those allegations. *See id.* One rejoinder is that a prior determination is not necessary for an insured to file a declaratory judgment action seeking to determine its obligations to an insured. This is true but unavailing because in that situation, the four-corners rule undoubtedly applies. *Id*. ("When resolving an insurer's obligations in an anticipatory declaratory action brought before the conclusion of the underlying dispute, an insurer's duty to defend is determined from the face of the complaint."). For these reasons, I confine my duty to defend analysis to allegations in the underlying complaint.

With these issues addressed, I now turn to the limiting language and exclusions that Mid-Con submits precluded a duty to defend HNI.  By definition, these limitations and exclusions are independent reasons for why coverage was lacking.  Thus, to conclude that no duty to defend existed, I need only determine that coverage lacked due to just one of the limitations or exclusions.  Conversely, to conclude that Mid-Con indeed had a duty to defend HNI, I must determine that none of the limitations or exclusions applies.  Recall that "[t]o avoid policy coverage, an insurer must establish that the exemption claimed applies in the particular case, and that the exclusions are not subject to any other reasonable interpretations."  *Hecla*, 811 P.2d at 1090; *see also Koncilja v. Trinity Univ. Ins. Co.*, 528 P.2d 939, 941 (Colo. App. 1974) (having affirmatively expressed coverage through broad promises, the insurer assumes a duty to define any limitations upon that coverage in clear and explicit terms). Indeed, "[t]he insurer has a duty to defend unless the insurer can establish that the allegations in the complaint are solely and entirely within the exclusions in the insurance policy." Hecla, 811 P.2d at 1090.  As a result, "[a]n insurer is not excused from its duty to defend unless there is no factual or legal basis on which the insurer might eventually be held liable to indemnify the insured."  *Id.*  I address Mid-Con's various limitations and exclusions *seriatim*.

### i. Limitations in the Additional Insured Endorsements

Mid-Con argues that the two endorsements that made HNI an additional insured under the policy preclude coverage.  These are the aforementioned AIE 10 81 and additional insured endorsement 13 57 (11 01) ("AIE 13 57") (together, the "AIEs").  *See* Mid-Con Policy at 23 and 24. AIE 10 81 stated that "WHO IS AN INSURED (Section II) is amended to include as an insured the

person or organization shown in the Schedule, but only with respect to liability directly attributable to *your performance* of ongoing operations *for that insured*." *See* Mid-Con Policy at 24 (emphases added).  AIE 13 57 similarly provides that "WHO IS AN INSURED (Section II) is amended to include as an insured the person or organization shown in the Schedule, but only with respect to liability directly attributable to *your performance* of 'your work' *for that insured*." Mid-Con Policy at 23 (emphases added).

Mid-Con first argues that "your" in both AIEs refer to Orr as the "Named Insured" and that "that insured" refers to HNI.  It asserts "Orr never did any work for HNI; rather, it is *undisputed* that [] Orr did its work for BVPC only." Therefore, Mid-Con concludes, per the terms of the endorsements, it had no duty to defend HNI because HNI is an additional insured thereunder only when its liability is directly attributable to Orr's work for HNI.

I agree with Mid-Con's interpretation of the AIEs, as the language is unambiguous, but I disagree with its conclusion.  The underlying complaint alleges that BVPC and HNI were "alter egos" or, alternatively, that the HNI and BVPC were engaged in a joint venture such that each was an agent of the other, and that HNI supervised, directed, and approved Orr's work.  *See*  Pl.'s Mot. Ex. A-3, ¶¶ 29, 30.  Were these allegations sustained, excluding other exclusions and limitations, they would impose liability under the policy because Mid-Con agrees that BVPC was an additional insured under the policy and that it worked for BVPC. (Mid-Con does not contest the "liability directly attributable" language from the AIEs.)  Therefore, the AIEs did not limit coverage on this ground. (I note parenthetically that this is the area in which both parties rely on evidence outside the underlying complaint, *see, e.g.*, Pl.'s Mot. Ex. 8, Def.'s Resp. at 22, and Pl.'s Reply at 7-8, but because I concluded that the general rule from *Cotter* applies, I do not consider extrinsic evidence

at this stage.)

Mid-Con additionally argues that AIE 10 81 limited coverage on another ground. It homes in on the "ongoing operations" language and contends that under Colorado law, that language limits coverage for the additional insured to damages arising before Orr completed its operations in the Project and therefore does not cover HNI for damages or liability arising after Orr's operations were completed. Mid-Con then argues that the underlying complaint fails to allege that any damage occurred before Orr's work on the Project was complete and that the complaint in fact alleges the contrary. Thus, Mid-Con concludes, there was no duty to defend HNI.

Courts have indeed held that under Colorado law, additional endorsements nearly identical to AIE 10 81 do not cover "completed operations." *See United Fire*, 633 F.3d at 958-59, *and Weitz*, 181 P.3d at 313-15. Another peculiarity manifests here because the parties do not dispute the meaning of the language in the policy; they dispute the meaning of allegations in the underlying complaint. I turn to the pertinent allegations.

After alleging a cornucopia of construction defects and deficiencies, the complaint alleged the following:

> On information and belief, these and other errors, deficiencies and defects . . . have caused, and continue to cause, actual property damage, loss of use and/or other losses to the Association, and consequential damages to, and the loss of use of various elements of the Project, *over time from the date those areas were first put to their intended use*.

Pl.'s Mot. Ex. A-3, ¶ 42 (emphasis added). Mid-Con explains that under its policy, Orr's work was "deemed completed . . . [w]hen that part of the work done at the job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project," even if the work "may need service, maintenance, correction, repair or replacement,

but which is otherwise complete." Mid-Con Policy § V.16 at 21. Therefore, Mid-Con concludes, because the underlying complaint alleged that damages began when Orr's work was put to its intended use, coverage was excluded.

It is worth reiterating the insured-friendly principles governing the determination of whether an insurer had a duty to defend. An insurance company has a duty to defend if the allegations in the complaint *could* impose liability under the policy; if the allegations in the complaint state a claim which is *potentially or arguably* within the policy coverage; or if there is *some doubt* as to whether a theory of recovery within the policy coverage has been pleaded. *Hecla*, 811 P.2d at 1089. Mid-Con must therefore establish that the allegations in the underlying complaint are "solely and entirely" within this limitation. *Id.* at 1090. It does not.

In the first instance, Mid-Con interprets the "first put to their intended use" language as though it has the import and meaning defined in the policy. It is not clear to me that the Association intended that consequence but rather used a general, umbrella phrase in its pleading that would apply equally yet separately to each alleged deficient or defective area. This is permissible. *See Dish Network Corp. v. Arch Specialty Ins. Co.*, 659 F.3d 1010, 1015-16 (10th Cir. 2011) ("Insurers have a 'heavy burden to overcome in avoiding the duty to defend, such that the insured need only show that the underlying claim may fall within policy coverage; the insurer must prove it cannot. This liberal approach recognizes the reality that notice pleading does not contemplate detail and specificity, and a complaint may initially lack detail necessary to conclusively establish the duty.") (internal quotations and citations omitted).

Additionally, Mid-Con fails to demonstrate that the policy's prescription for when work is deemed completed applies to AIE 10 81. The provision that Mid-Con cites for when work is deemed

completed is part of the definition of "products-completed operations hazard " ("PCOH"). *See* Mid-Con Policy, § V.16 at 21. PCOH is a specific term that is found within two policy exclusions, neither of which Mid-Con relies on here. AIE 10 81 does not use the term. Mid-Con fails to show why it can eviscerate the definition of PCOH by taking out a select portion therein and apply it to an endorsement that does not even mention or reference the PCOH.

More importantly, assuming that the Association employed "first put to its intended use" as a term of art, Mid-Con fails to recognize that the allegation quoted above leaves open the possibility that the identified areas were "first put to their intended use" by a subcontractor or other contractor. In that case, Orr's work would *not* be deemed "completed." *See* Mid-Con Policy § V.16 at 21.

Alternatively, again assuming, *arguendo*, that "first put to its intended" indeed means that an area was "completed," that still does not mean that damages did not begin to flow during Orr's ongoing operations. Stated differently, ongoing operations and completed work need not be mutually exclusive at this stage. The complaint alleged deficiencies, errors, and defects in a host of areas, including roofs, balconies and decks, civil/grading/site work, the parking garage, plaza deck, windows and doors, and stone facade system, to name a few. Under paragraph 42's allegation, it is possible (and in fact probable) that one of these areas, for example the grading, was put to its "intended use," and Orr then moved on to work on another area, perhaps the parking structure. By the allegation, damages from defective grading could have begun to flow, but Orr still has ongoing operations because it is working on the parking structure. *See TCD, Inc. v. American Family Mut. Ins. Co.*, - - - P.3d - - -, 2012 WL 1231964, *2 (Colo. App. 2012) ("[W]e construe coverage provisions in an insurance contract liberally in favor of the insured to provide the broadest possible coverage."). To that point, Mid-Con itself argues that Orr's operations and work, as the Project's

general contractor, was the *entire* Project.  In related arguments, Mid-Con cites *Martinez*, 576 P.2d 1017, for the proposition that "once any particular part of the work out of which the damage arose had been put to its intended use, any damage to that work is subject to the [PCOH]. As such it is severable from the rest of work which may not yet be deemed completed, and would still be subject to other exclusions."  In essence, Mid-Con asserts that *Martinez* refutes my hypothetical by holding that once one area or "particular part" is first put to its intended use, it is "complete" for purposes of the policy even if the entire project is not. Mid-Con misconstrues *Martinez*. There, the court held that "the fact that the latching component of a door did not work and had not yet been repaired did not render the construction of the house incomplete." *Id.* at 1020.  Thus, in *Martinez*, the entire project–the house–was already finished.  But in my hypothetical, which is conceivable under the underlying complaint, the Project is patently incomplete when damages began to flow.

In sum, contrary to other cases in which an allegation unambiguously averred that damages arose after operations were completed, here the damages "might" have arisen during Orr's ongoing operations. *See, e.g.*, *United Fire*, 633 F.3d at 959 ("[A]ny claimed damage in this case was alleged to have arisen after operations were completed. . . . BPR's underlying complaint against M&R contained the following pertinent allegations of damage: 33. Summit began installing the floor boards in the Units at One Boulder Plaza on or about November 2002, and it *completed the installation process on or about April, 2003.* 34. *Shortly after installation was complete,* many of the floors installed ... began to exhibit signs of cupping, or upward warping of the outside edges of the floor boards. 36. *Subsequent to the floors cupping,* the floors in many of the Units began to exhibit signs of disbondment, panelization, and splitting. . . . [T]hese allegations refer to completed, rather than ongoing operations, and that ends the matter.").  That is all that is necessary at this stage.

24

Thus, the "ongoing operations" language in AIE 10 81 did not preclude coverage here; it therefore did not immunize Mid-Con from a duty to defend.

### ii. Exclusion l and Endorsement CG 22 94 10 01

Mid-Con next argues that exclusion l, as amended by endorsement CG 22 94 10 01, excluded coverage. This endorsement is the exclusion for property damage to "your work"–that is, to Orr's work. That endorsement provides the following:

> Exclusion l. of Section I - Coverage A - Bodily Injury And Property Damage Liability is replaced by the following:
>
> 2. Exclusions
>
>> This insurance does not apply to:
>>
>> l. Damage to Your Work
>>
>> "Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard."

Mid-Con Policy at 24. Section V of the policy prescribes the definitions of the three terms in quotes:

> 16. "Products-completed operations hazard":
>
>> a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising our of "your product" or "your work" except"
>>> . . .
>>>
>>> (2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:
>>>> (A) when all of the work called for in your contract has been completed.
>>>>
>>>> (B) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.
>>>>
>>>> ( C) when that part of the work done at a job site has been put

25

> to its intended use by any person other than another contractor or subcontractor working on the same project.
>
> Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

17. "Property damage" means:

> a. Physical injury to tangible personal property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
>
> b. Loss of use tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of he "occurrence" that caused it.

22. "Your Work":

> a. Means:
>
> > (1) Work or operations performed by your or on your behalf; and
> > (2) Materials, parts or equipment furnished in connection with such work or operations.
>
> b. Includes
>
> > (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work."
> > (2) The providing of or failure to provide warnings or instructions.

*Id.*, § V.16, 17, 22 at 21, 22.

Mid-Con argues that, according to the underlying complaint, the property damage was to Orr's work, and that the damaged work is included in the products-completed operations hazard ("PCOH"). Beginning with whether the property damaged alleged was to Orr's work, Mid-Con submits that Orr's work consisted of the Project in its entirety. It then asserts that the damages alleged in the underlying lawsuit fall within the PCOH because the previously discussed paragraph 42 of the underlying complaint alleges that damages arose after the damaged portions of the property

had "first been put to their intended use."

I disagree with Mid-Con that this endorsement precluded a duty to defend because Mid-Con fails to establish that the damages alleged in the underlying complaint occurred "solely and entirely within" the exclusion. *See Hecla*, 811 P.2d at 1090. The PCOH exception "applies only if the work at issue was completed *when the damage occurred*." *McGowan v. State Farm Fire and Cas, Co.*, 100 P.3d 521, 524 (Colo. App. 2004). Yet, as discussed above, under the allegations in paragraph 42, the alleged deficient or defective areas of Orr's work "might" have been "first put to their intended use" by a subcontractor or other contractor, which means that Orr's work would *not* be deemed "completed" under the PCOH. (Mid-Con does not argue that any other event listed in PCOH occurred that would have deemed Orr's work completed. I therefore circumscribe my analysis to the "first put to intended use" situation.) It is also possible that one of the problematic areas of Orr's work, for example the grading, was put to its "intended use" by the Association and Orr then moved on to another component of its work, perhaps the parking structure. By the allegation, damages from defective grading could have begun to flow, but Orr may still have been "working" because it had not completed the entire Project, which, by Mid-Con's own admission, was Orr's "work."

Additionally, paragraphs 42 and 45 of the underlying complaint allege *non-property* damages, injuries, and losses to the Association and individual owners. *See* Pl.'s Compl. Ex. A-3 ¶ 42 (On information and belief, these and other errors, deficiencies and defects . . . have caused, and continue to cause, actual property damage, loss of use *and/or other losses to the Association*), ¶ 45 (As a result of the acts and/or omissions of the Defendants, the Association has sustained damages including, by way of illustration, property damages, diminished value, past and future

27

repair and mitigation expenses, loss of use of all or portions of the Project, attorney fees and litigation costs, *among other damages, injuries and losses, including damages, injuries or losses paid or incurred by others . . . .*).  It is possible under these allegations that personal injuries were sustained. These would not be "property damage."  The allegations also leave open the possibility that the damages might not have been exclusively to Orr's work.  In either case, this exclusion would not exclude coverage.  It therefore did not immunize Mid-Con from a duty to defend HNI against all claims.  *Sachs*, 251 P.3d at 546 ("An insurer has a duty to defend its policyholder when the underlying complaint alleges *any facts* or claims that might fall within the ambit of the policy. The insurer must defend against all claims as long as any one of them is arguably covered under the policy."); *Bainbridge,* 159 P.3d at 756 ("An insurer's duty to defend extends to all claims asserted against its insured if the allegations in the complaint support any one claim that is arguable within the policy.").

### iii. Exclusions j(5) and j(6)

Mid-Con lastly argues that it had no duty to defend HNI because exclusions j(5) and (6) dovetail to independently bar coverage for property damage to Orr's *incomplete* work.  These exclusions provide that the policy does not apply to " 'property damage' to: (5) That particular part of real property on which [Orr] or any contractors or subcontractors working directly or indirectly on [Orr's] behalf are performing operations, if the 'property damage' arises out of those operations" or to "(6) That particular part of any property that must be restored, repaired, or replaced because '[Orr's] work' was incorrectly performed on it." Mid-Con Policy, Coverage A § I.2.j(5), (6), at 10. There is an exception, however, to j(6): it "does not apply to 'property damage' included in the '[PCOH]'." Mid-Con Policy Coverage A § I.2.j at 11.

Colorado case law on j(5) and j(6) is sparse. This Court, however, has previously reviewed these exclusions, stating that "[b]oth exclusions (j)(5) and (j)(6) apply to damage occurring *while the insured's work is ongoing*." *Continental Western Ins. Co. v. Shay Const., Inc.*, 805 F.Supp.2d 1125, 1131 (D. Colo. 2011) (emphasis added). And though it was applying Kansas law, the Tenth Circuit interpreted a policy similar to the one before me containing these exact exclusions in *Advantage Homebuilding, LLC. v. Maryland Cas. Co.*, 470 F.3d 1003 (10th Cir. 2006). *Advantage* held that "exclusion j(5) applies whenever *property damage* 'arises out of the work of the insured, its contractors, or its subcontractors, while 'performing operations.'. . . Hence, the exclusion applies only to damage from ongoing work, and not damage after completion." *Id.* at 1011 (internal quotations and citations omitted); *see also Continental Western*, 805 F.Supp.2d at 1131 ("Exclusion (j)(5) generally applies when work is in progress and focuses on the area on which the insured is performing work. . . .").

"Exclusion (j)(6), on the other hand, focuses on the repair of that work and expressly does not apply if the work has been completed." *Continental Western*, 805 F.Supp.2d at 1131. In *Advantage*, the Tenth Circuit concluded that j(6) "was intended to exclude 'property damage' that directly or consequentially occurs from the faulty workmanship of the insured and its contractors/subcontractors (i.e., work that "was incorrectly performed") while the work is ongoing." *Advantage*, 470 F.3d at 1012. It further held, however, that "[t]he express exception to exclusion j(6) . . . allows an insured to recover consequential damages that arise out of his or her faulty workmanship after the completion of the work." *Id.* The distinction between exclusions j(5) and j(6) has been explained in the following way:

> When the work is currently being performed by the contractor, it should be readily apparent whether the work is being performed appropriately. If the contractor fails

to remedy faulty work, it clearly would comprise a business risk [and should be excluded under exclusion (j)(5)]. In contrast, when the work is completed and accepted, but a latent defect later gives rise to a loss, there is clearly an element of fortuity that should be covered by insurance. An example of the latter situation would be a contractor building a house and first erecting the walls and installing the roof. After the roof is installed, the contractor begins working on the interior. The roof, however, was defectively installed and later leaks, causing damage to the partially completed floors. Exclusion (j)(6) would bar coverage for costs incurred in repairing or replacing the roof, but the cost of repairing the floors would be covered.

*Continental Western*, 805 F.Supp.2d at 1131-32 (internal citations omitted) (citing Robert J. Franco,

Insurance Coverage for Faulty Workmanship Claims Under Commercial General Liability Policies,

30 Torts & Ins. L.J. 785 (Spring 1995)); *accord Advantage*, 470 F.3d at 1012.

Although I agree with Mid-Con's interpretation of exclusions j(5) and j(6), I again disagree with its ultimate conclusion.  Mid-Con fails to show that the damages alleged in the underlying complaint fall "solely and entirely" within the exclusion. Returning to paragraph 42 of the underlying complaint, it is possible that the property damage arose subsequent to Orr's completion of its work. For example, the complaint alleges settlement, creaking, and cracking of concrete flatwork; cracking in the walls of the Association's parking garage, water ponding in various areas; and homeowners hearing noise and vibrations in adjacent units.  It is unclear from the complaint when these occurred, and because no other allegations preclude it, these "might" be "latent defects later giving rise to a loss . . . that should be covered by insurance." *Continental Western,* 805 F.Supp.2d at 1132.  The underlying complaint also alleges that damages began once the identified areas were first put to their respective uses, which, as Mid-Con itself argued earlier, could have been after Orr and its subcontractors completed their work. In either case these exclusions would not apply.  *See Continental Western*, 805 F.Supp.2d at 1132 ("Both Exclusions (j)(5) and (j)(6) apply to damage occurring while the insured's work is ongoing."). These allegations distinguish this case

30

from *Advantage* and *Continental Western* where the courts concluded that exclusions j(5) and j(6) excluded coverage because the damages alleged occurred while the insureds' operations were ongoing. *See Advantage*, 470 F.3d at 1010 ("there was no dispute that the work was in progress when the subcontractor damaged the windows" because the windows were scratched when the subcontractor dropped mortar on them); *Continental Western*, 805 F.Supp.2d at 1132 ("The allegations recite that Milender White gave notice to Shay of the deficiencies during construction and that Shay damaged the work of other trades while repairing its own work. This strongly suggests that the property damage arose at the time that Shay was performing its work, rather than being the result of some kind of fortuity resulting from a latent defect in the work.").

Damages to  things other than Orr's defective work are also alleged. It is conceivable that the hypothetical above happened here: the allegedly defective installed interior drywall that cracked may have caused a hanging valuable or non-defective floor to be damaged.  In that case, exclusion j(6) would bar coverage for costs incurred repairing or replacing the drywall, but the costs of repairing the valuable or floor would be covered. *Id.* Furthermore, as explained above, paragraphs 42 and 45 of the underlying complaint allege *non*-property damages, which might also render these two exclusions inapposite, triggering Mid-Con's duty to defend.  *Sachs*, 251 P.3d at 546 ("An insurer has a duty to defend its policyholder when the underlying complaint alleges *any facts* or claims that might fall within the ambit of the policy."); *Bainbridge*, 159 P.3d at 756 ("An insurer's duty to defend extends to all claims asserted against its insured if the allegations in the complaint support any one claim that is arguable within the policy.").

In sum, Mid-Con fails to show the allegations in the underlying complaint are "solely and entirely" within exclusions j(5) and j(6). Accordingly, Mid-Con had a duty to defend HNI in the

Underlying Litigation. I therefore grant this portion of EMC's motion.

### 2. Discharging a Duty to Defend

I turn to whether Mid-Con breached its duty to defend Smith or HNI in the Underlying Litigation. Mid-Con refused to defend Smith altogether; it agreed to defend HNI.

Beginning with Smith, because Mid-Con did not have a duty to defend her, *see* Part III.A.1(a), *supra*, it could not have breached that duty. I therefore deny this portion of EMC's motion and turn to whether Mid-Con breached its duty to defend HNI.

In *Signature*, the Tenth Circuit addressed the requirements for discharging a duty to defend. Once defense obligations have been triggered, an insurer must provide its insured an "active independent" defense. 230 F.3d 1215. There, an insurer agreed to defend its insured in two actions, subject to a reservation of rights. *Id.* at 1217. After the two cases settled, the insured then brought suit against the insurer, alleging that the latter had breached its duty to defend per the insurance policy. *Id.* at 1218-19. The insurer asserted that it had appointed a law firm to defend the insured, had conducted a thorough and diligent internal investigation as to its duty to indemnify, prepared to reimburse a co-insurer for its defense costs as required under Colorado law, and had set up a reserve for the claim and was prepared to contribute to its share of defense costs and indemnity payments. *Id.* at 1219-20. Nevertheless, the court held that "although [the insurer] pursued the above actions, these actions do not amount to an active independent defense" of the insured. *Id.* at 1220. The court found that the insurer was nonresponsive to settlement overtures, failed to communicate with the insured, and failed to fully cooperate in the settlement negotiations. *Id.* at 1220.

EMC's position is that Mid-Con's defense of HNI fell short of the "active independent"

standard applied in *Signature*. EMC avers that Mid-Con did not discharge its duty to defend HNI because Mid-Con failed to do the following: prepare discovery responses for HNI; assist HNI in preparing discovery responses propounded to HNI; appear on HNI's behalf in any depositions; to communicate analyses of HNI's potential liability or damages to HNI; to communicate any proposed settlement amounts that would be appropriate to assist settling the Underlying Litigation for HNI; and to clearly communicate to HNI and its personal coverage counsel what amount, if any, Mid-Con was contributing in settlement proceeds on HNI's behalf.

I conclude that genuine disputes over material facts exist that preclude summary judgment. First, there are genuine disputes as to what Mid-Con and its appointed firm did or did not do on HNI's behalf. Mid-Con presents evidence that it indeed responded to settlement communications; communicated directly to HNI and its principals; participated in multiple settlement conferences; paid $476,491.58 in attorney fees, experts fees, and other litigation costs related to defending BVPC and HNI; and contributed $100,000 to settle the Underlying Litigation on their behalf.  It also submits pleadings that McConaughy & Sarkissian drafted and filed for HNI.

Second, it is unclear what duties Mid-Con and McConaughy & Sarkissian were *supposed* to undertake with respect to defending HNI. Both EMC and Mid-Con agreed to defend HNI in the Underlying Litigation. Because of the relationships and overlapping interests between the defendants therein, the defendants and their attorneys reached an agreement for a joint and coordinated defense. That agreement directed that Lambdin & Chaney, the firm appointed by EMC, would have primary responsibility of defending HNI and that McConaughy & Sarkissian, the firm Mid-Con appointed, would have the primary duty of representing BVPC.  It is unclear how the defense agreement allocated defense duties. McConaughy & Sarkissian may not have even been responsible for the

duties EMC cites as evidence of a deficient defense; as the undisputed "lead counsel" for HNI, Lambdin & Chaney's may had been responsible for them. Further factual development is thus required to decide whether a duty to defend was breached.

EMC has not established the absence of a material factual dispute concerning what Mid-Con and McConaughy & Sarkissian were *supposed* to do pursuant to the defendants' defense coordination agreement and, second, what they *actually* did or did not due. I therefore deny this portion of EMC's motion.

### B. Whether Mid-Con Has a Duty to Indemnify Smith or HNI

EMC's motion also seeks a declaration that Mid-Con owes indemnity to it for what it paid to settle the Underlying Litigation on behalf Smith and HNI. "The duty to defend is separate and distinct from an insurer's obligation to indemnify its insured." *Hecla*, 811 P.2d at 1086 n.5. "The duty to indemnify relates to the insurer's duty to satisfy a judgment entered against the insured." *Cyprus*, 74 P.3d at 299. The duty "arises only when the policy actually covers the harm and typically cannot be determined until the resolution of the underlying claims." *Id.* at 301. The determination of whether coverage is ultimately available is a question of fact. *Id.* (citing *Hecla*, 811 P.2d at 1089). Colorado court's "consistent recognition that the trigger for the duty to indemnity flows from the nature of the ultimate verdict, judgment or settlement." *Id.*

In resolving indemnity disputes, the trial court should "certainly" look to the operative complaint as an important factor. *Id.*"When the facts pled, claims asserted and relief sought do arguably include a loss for which an insured would potentially be liable, that cannot be the end of the inquiry." *Id.* Instead, "at that point, the court must look to the facts as they developed at trial and the ultimate judgment. . . . In short, certainly no verdict can enter on a claim not pled and proven,

but the complaint, as amended, is but the starting point in that analysis." *Id.* But where, as here, the underlying claims "d[id] not proceed through the crucible of trial, and instead are settled by the parties, the analysis becomes more difficult." *Id.* In this situation, the *Cyprus* court instructed that

> [a]gain, the first step must be the final version of the complaint, for if no colorable claim is made that would invoke indemnification coverage, then the presumption is that no such coverage exists. However, notice pleading does not contemplate detail and specificity, and certainly, a trial court could review other matters in arriving at a conclusion as to whether some portion or all of the settlement would be properly subject to indemnification.
>
> The determination of whether a duty to indemnify exists requires factual development, as it is largely a question of fact. Extrinsic evidence may assist the trial court in determining whether and to what extent actual liability, as represented by a verdict or settlement, is covered by an existing policy.

*Id.* at 301-02. I apply these principles to the instant matter, beginning with Smith.

### 1. Smith

I held in Part III.A.1.a, *supra*, that Mid-Con did not have a duty to defend Smith. "The Colorado Supreme Court has repeatedly held that '[w]here there is no duty to defend, it follows that there can be no duty to indemnify.' " *United Fire*, 633 F.3d at 961 (quoting *Compass*, 984 P.2d at 621); *accord Cyprus*, 74 P.3d at 300 ("We reiterate[] that where no duty to defend exists, it follows that there can be no duty to indemnify."). Hence, Mid-Con does not have a duty to indemnify EMC for its costs related to Smith. I accordingly deny this portion of EMC's motion.

### 2. HNI

I determined above that based upon the four-corners of the underlying complaint, Mid-Con had a duty to defend HNI. Now, as *Cyprus*, explains, when I revisit the terms of the Mid-Con Policy to see if coverage existed, I look at the facts as they have developed and consider extrinsic evidence.

I begin as I did *supra* with the limitations in the AIEs. (I note parenthetically that a possible determination that Mid-Con breached its duty to defend does not preclude me from addressing its alleged duty to indemnify because "an insurer who breaches its duty to defend may contest coverage." *Signature*, 230 F.3d at 1221.)

Mid-Con argues that AIEs 10 81 and 13 57 preclude coverage because Orr did not perform or do work for HNI. *See* Mid-Con Policy at 23 and 24.  I ruled above that based strictly on the allegations underlying complaint, Orr might have done work for HNI. *See* Part III.A.2(ii), *supra*. But the factual development and extrinsic evidence before me, which I now consider, shows Orr did not.

It is clear from Smith's discovery responses and affidavit given in this litigation and attached to EMC's motion that Orr worked only for BVPC–not HNI. In her affidavit, she states that "HNI is not a member or manager of [BVPC] and had never been, and HNI has not participated or been involved in any decision making for [BVPC's] business decisions." *See* Pl.'s Mot Ex. F ¶ 4. In her sworn discovery responses, Smith further states that "HNI did not have any material involvement with the design or construction of the [the Project] and HNI's involvement in construction ended with the formation of [BVPC]." Def.'s Resp. Ex. 2 at 10, ¶¶ 8-9.  The construction contract pursuant to which Orr became involved with and completed the Project was between just Orr and BVPC. *See* Pl.'s Mot. Ex. F-1. The weight of this evidence is even greater when one considers that it comes from EMC. This is the position that EMC held in its motion.

In its reply (and, therefore, its response to Mid-Con's motion), however, EMC reverses course and contends that Orr actually did perform work for HNI. In support, EMC leans on two things. First, it harkens back to the allegations in the underlying complaint, but showing that a duty

36

to indemnify exists requires more. *See Cyprus*, 74 P.3d at 299-302.  Second, it cites and quotes three

emails and two letters from Smith to Orr's president in which Smith submitted certain inquiries and

requests pertaining to Orr's work. *See* Pl.'s Reply at 7-8.

This evidence does not assist EMC even when taken in a light most favorable to it.

Assuming, *arguendo*, that it demonstrate a genuine issue of material fact as to whether Orr was

working for HNI when they were sent, the correspondence describes work occurring after the

expiration of the Mid-Con Policy. No coverage could arise under the policy for work allegedly

performed by Orr after the policy expired.  *See Globe Indem. Co. v. Travelers Indem. Co. of Ill.*, 98

P.3d 971, 975 (Colo. App. 2004); *Leprino v. Nationwide Prop. & Cas. Ins. Co.*, 89 P.3d 487, 491

(Colo. App. 1993). This evidence does nothing to show that Orr was working for HNI *during* the

time the Mid-Con Policy was in effect.  EMC offers nothing more to show that was the case. The

lack of that evidence, combined with the weighty countervailing evidence cited above, leads me to

conclude that a rational trier of fact could not conclude that Orr was working for HNI during the

policy period and would instead conclude that Orr did not perform work for HNI. I therefore

determine that Mid-Con does not have a duty to indemnify HNI because of the AIEs' limitations.

Accordingly, I deny this portion of EMC's motion. *See Adler*, 144 F.3d at 670 (citing *Anderson*, 477

U.S. at 248). I decline to address the remaining exclusions that Mid-Con argues preclude coverage

because I need not do so.

### C. Whether the Mid-Con Policy Afforded Primary or Excess Coverage

EMC lastly requests a declaration that its coverage of HNI and Smith is excess, and Mid-

Con's is primary. This request, and EMC's accompanying argument, presupposes coverage under

the Mid-Con Policy, but as I determined above, the Mid-Con Policy covered neither Smith nor HNI. Whether Mid-Con's Policy had primary or excess coverage for HNI, Smith, both, or neither is therefore an issue that I need not decide. *See* Mid-Con Policy § IV.4 at 17 ("Other Insurance. If other valid and collectible insurance is available to the insured *for a loss we cover . . . .*"). Accordingly, I deny this portion of EMC's motion as moot.

### D. Mid-Con's Motion

Mid-Con's motion seeks summary judgment as to all six of EMC's claims. Those claims are (1) equitable subrogation; (2) equitable contribution; (3) declaratory judgment; (4) unjust enrichment; (5) estoppel; and (6) indemnity. The motion nearly perfectly tracks the arguments Mid-Con advanced in its response to EMC's motion. It simply adds that because Mid-Con had no duty to defend or indemnify Smith or HNI, Mid-Con is entitled to summary judgment as to all of EMC's six claims. EMC argues that its claims withstand summary judgment. For clarity and brevity, I address the claims out of order and address four of them together.

I note one argument by EMC at the outset. At various points throughout its response, EMC suggests that Mid-Con's motion is premature because there has not been sufficient time for factual development. I am not persuaded. EMC apparently felt that there had been sufficient factual development to file its motion and seek a declaration that Mid-Con had a duty to indemnify EMC, which requires factual development and, as it turns out, was the issue from which its remaining claims would flow or not flow. EMC also fails to follow the proper procedure for making such an assertion. *See* Fed. R. Civ. P. 56(d) ("If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may . . . ."). I now turn to EMC's claims.

38

## 1. Declaratory Judgment

EMC's declaratory judgment claim was the subject of EMC's motion and Parts III.A-C. I determined above that Mid-Con had no duty to defend or indemnify Smith, no duty to indemnify HNI, and, as a corollary, denied the primary versus excess declaration was moot. I accordingly grant Mid-Con's motion in so far as it seeks summary judgment of these portions of EMC's declaratory judgment claim.  However, because I determined that Mid-Con had a duty to defend HNI and that material factual disputes prohibit summary judgment as to whether Mid-Con breached that duty, I deny Mid-Con's motion insofar as it seeks summary judgment of that portion of the declaratory judgment claim.

## 2. Estoppel

Turning to EMC's claim for estoppel–and, apparently, quasi-estoppel–EMC argues that Mid-Con is estopped from challenging coverage because it defended HNI under a reservation of rights after first disclaiming coverage. This claim fails as a matter of law because "[t]he rule is well established that the doctrines of implied waiver and of estoppel, based upon the conduct or action of the insurer, are not available to bring within the coverage of a policy risks not covered by its terms." *Hartford Live Stock Ins. Co. v. Phillips*, 372 P.2d 740, 742 (Colo. 1962). Estoppel "cannot have created liability where non existed under the policy." *Empire Cas. Co. v. St. Paul Fire and Marine Ins. Co.*, 764 P.2d 1191, 1198 (Colo. 1988).  An insurer that reconsiders its decision to provide a defense under a reservation of rights is not barred from later contesting coverage and its duty to defend. *See, e.g.*, *American Economy Ins. Co. v. Schoolcraft*, 551 F.Supp.2d 1235, 1241 (D. Colo. 2007) ("I conclude that the fact that American Economy at some point made the strategic decision to offer a defense under a reservation of rights, and then reconsidered, does not create a

legal duty to defend where there is none under the facts alleged in the complaint under the law."); *c.f. Flannery v. Allstate Ins. Co.*, 49 F.Supp.2d 1223, 1228-29 (D. Colo. 1999) (holding that an insurer is not estopped from challenging its duty to indemnify even if it had–and breached–its duty to defend). I therefore grant Mid-Con's motion with respect to this claim.

### 3. Equitable Subrogation and Contribution, Unjust Enrichment, and Indemnity

With each of these four claims, EMC seeks reimbursement for the funds it expended in defending and settling the Underlying Litigation on behalf of HNI and Smith. *See* Compl. at 11-18. The equitable subrogation and contribution claims also seek reasonable costs and attorneys fees stemming from this action. *See id.* at 11-14.

Mid-Con argues that these claims must be dismissed because it had no duty to defend or indemnify. Were that the case, Mid-Con would be correct. Where an insurer has no duty to defend or indemnify, it is not liable for the funds the insured expended in defending and settling the underlying action, and the insured's related claims flowing from the insurer's refusal to defend cannot withstand summary judgment. *See, e.g.*, *Wheeler v. Reese*, 835 P.2d 572, 577 (Colo. App. 1992); *American Economy*, 551 F.Supp.2d at 1245; *Nat'l Cas. Co. v. Great Southwest Fire Ins. Co.*, 833 P.2d 741, 747 n.2 (Colo. 1992); *Tynan's Nissan, Inc. v. American Hardware Mut. Ins. Co.*, 917 P.2d 321, 326 (Colo. App. 1995). Similarly, where an insurer discharged its duty to defend and coverage was nonexistent, it may seek reimbursement for those costs it expended in defending the insured. *Wheeler*, 835 P.2d at 577; *Hecla*, *supra*.

This, however, is not the situation, at least not yet. Here there is an insurer having no duty to indemnify due to a lack of coverage but having a duty to defend. Whether it breached that duty has yet to be decided. Neither party addresses this situation and the consequences therefrom with

respect to possible liability and EMC's other related claims.

I find guidance in *Signature*. 230 F.3d 1215.  As discussed, the court there concluded that an insurer breached its duty to defend its insured in underlying litigation that ultimately settled. *See id.*  It held that the insurer that had breached its duty to defend, Royal, owed the other insurer that had defended the insured, Signature, a pro rata portion of attorney fees, costs and expenses incurred in reaching settlement in the underlying litigation.  *Id.*; *see also Bainbridge*, 159 P.3d at 756-57 (holding that an insured who breaches it duty to defend is liable for "the costs and reasonable attorney fees incurred by the insured in defending [] against the claims asserted," as well as "consequential damages").  The court also concluded that Royal did not have a duty to indemnify because coverage lacked.  *Signature*, 230 F.3d at 1222-24.  While the noncoverage determination "might have been a defense to the claims in the underlying action," it "did not excuse Royal from fully defending the claims in the first instance."  *Id.* at 1220. The court stated why Royal must contribute to the defense costs even where it had no duty to indemnify:

> [T]o hold that Royal is insulated from contributing any defense costs because Royal notified Signature of its reservation of rights to seek reimbursement should we determine that the events were not covered by Royal's policy would amount to permitting the insurer to do indirectly what it cannot do directly. *Hecla Mining Co.* demands that an insurer notify the insured of its reservation of rights *and* requires the insurer to "provide a defense."
>
> Signature had a contract right to have actions against it defended by Royal, at Royal's expense, subject to Royal's reservation of its rights. A reservation of rights agreement serves to "furnish temporary protection to an insured, even though [as in this case] it may turn out that the insured was not entitled to such protection." We have held Royal in breach of that contractual duty because Royal offered little or no protection to its insured. Further, Royal did not seek a declaratory judgment as to its duty after the underlying litigation was resolved. We cannot allow Royal to benefit from its breach, for to do so compels the insured to bear the expense of the litigation, and Signature is actually no better off financially that if it never had the contract right of a defense from Royal. A natural and proximate result of Royal's breach was the participation by Traveler's as the only insurer in the continued litigation and

> settlement proceedings. Traveler's subsequently assigned its rights to seek contribution from Royal to Signature. We hold that Signature is therefore entitled to receive from Royal a pro rata portion of attorney fees, costs and expenses incurred in reaching settlement in the underlying litigation.

*Id.* at 1221-22 (internal citations omitted).   For these reasons, and because of the distinction Colorado draws between the duty to defend and indemnify, *Signature* held that even when an insurer has no duty to indemnify because coverage is wanting, "when an insurer breaches its duty to defend, the insured is entitled to receive compensation for any prejudice the insured may have suffered as a result of the breach."  *Id.* at 1222; *see also Hamlin, Inc. v. Hartford Accident & Indem. Co.*, 86 F.3d 93, 94-95 (7th Cir. 1996) (giving example of prejudice suffered by insured and stating "If the lack of a defender causes the insured to throw in the towel in the suit against it, the insurer may find itself obligated to pay the entire resulting judgment or settlement even if it can prove lack of coverage.").   Neither party submits, nor do I know of, a case more on point than *Signature*. Additionally, the Colorado Court of Appeals in *Bainbridge* appeared to countenance that an insurer is liable for a breach of its duty to defend even if it lacked a duty to defend.  *See* 150 P.3d 754-56.

Cotter and Hecla appear consonant with *Signature*'s approach.  90 P.3d 84; 811 P.2d 1083. They allow an insurer to seek reimbursement for defense and settlement costs should there be a determination that coverage was wanting.  In that case, the end result would be that the insurer has nothing out of pocket, as it has been paid back the sums it spent to defend and settle on the insured's behalf.  But those cases require that the insurer have actually *defended* the insured.  *See, e.g.*, *Cotter*, 90 P.3d at 827 ("Therefore, [the court] allowed insurers that *provide a defense* to rely on facts outside of the complaint to determine whether they could recover the costs of defense from the insured.") (emphasis added).   It is safe to infer that the Colorado Supreme Court was not contemplating just a nominal defense but a more rigorous and adequate one.  It surely would not

allow an insurer to be reimbursed for a defense that falls below that required by law even if coverage was ultimately determined to be lacking, as that "defense" would be tantamount to no defense at all. Permitting a defending insurer to seek reimbursement from an insurer who failed to discharge its duty to defend even if the latter lacks a duty to indemnify is also congruent with the stark distinction Colorado draws between the duties. *See, e.g. Cotter, supra.*

Guided by the cases above, I conclude the following. Because Mid-Con has no duty to indemnify HNI or Smith due to a lack of coverage, as a matter of law, it is not responsible for the payments EMC made to settle the Underlying Litigation on their behalf. Similarly, because it had no duty to defend Smith, EMC is not entitled to reimbursement from Mid-Con for the amount EMC spent in defending her. I therefore grant Mid-Con's motion to the extent it seeks summary judgment as to those portion of these four claims.

Mid-Con, however, had a duty to defend HNI, and it must still be determined whether it fulfilled that duty. These four claims depend on that finding, for if it is found that Mid-Con discharged its duty–that it "provided a defense" to HNI–Mid-Con would owe EMC nothing. *See Wheeler*, 835 P.2d at 577; *American Economy*, 551 F.Supp.2d at 1245. If it is found that Mid-Con did not discharge its duty, it would be liable to EMC for a pro rata portion of attorney fees, costs and expenses incurred in reaching settlement in the underlying litigation, as well as consequential damages. *Signature*, 230 F.3d at 1221-22; *Bainbridge*, 159 P.3d at 756-57. This is because the noncoverage determination did not excuse Mid-Con from discharging its duty to defend in the first instance. *Signature*, 230 F.3d at 1220; *Bainbridge*, 159 P.3d at 756-57. Furthermore, Mid-Con fails to proffer any legal authority for the proposition that it is entitled to summary judgment on these claims in their entirety even where it had a duty to defend. I therefore deny EMC's motion insofar

43

as it seeks summary judgment of the portions of these four claims seeking reimbursement for the costs EMC incurred in defending HNI. To be sure, if a jury finds that Mid-Con breached its duty to defend HNI, EMC could recover those costs only once. *See Rusch v. Lincoln-Devore Testing Lab, Inc.*, 698 P.2d 832, 834 (Colo. App. 1984) (party may not recover more than once for the same damages); *accord* CJI–Civ. 4th 6:14 (2004) ("If you find for the plaintiff on more than one claim for relief, you may award (him)(her) damages only once for the same (injuries) (damages) (losses).").

One aspect of the equitable subrogation and contribution actions linger: their claim for reasonable attorneys fees and costs deriving from *this* action. These are not recoverable because coverage was absent here. *Wheeler*, 835 P.2d at 577 ("[I]f the trial court finds that the incident resulting in liability *was covered by the policy*, then in addition to the expenses which the insured incurred in defending himself against the third party, the insurer also will be liable for attorney fees from the insured's action against insurer for breach of duty to defend.") (emphasis added). Accordingly, I further grant Mid-Con's motion to the extent it seeks summary judgment of the portions of EMC's equitable subrogation and contribution claims seeking reasonable costs and attorneys fees from this action.

## IV. Conclusion

For the foregoing reasons, IT IS ORDERED that

1) EMC's Motion for Partial Summary Judgment **[Docs # 24, 25]** is GRANTED insofar as it seeks a declaration that Mid-Con had a duty to defend HNI in the Underlying Litigation, but the rest is DENIED;

2) Mid-Con's Cross-Motion for Summary Judgment **[Doc #29]** is DENIED insofar as it

seeks summary judgment of that portion of EMC's declaratory judgment claim requesting a declaration that Mid-Con had a duty to defend HNI and that it breached that duty;

3) Mid-Con's motion is DENIED insofar as it seeks summary judgment of the portions of EMC's equitable subrogation, equitable contribution, unjust enrichment, and indemnification claims seeking reimbursement for the amount EMC paid to defend HNI the Underlying Litigation; and

4) The rest of Mid-Con's motion is GRANTED.

These orders leave the case to proceed in the following way: EMC has its declaration that Mid-Con owed HNI a duty to defend, but whether Mid-Con breached that duty has yet to be decided. EMC also keeps its equitable subrogation, equitable contribution, unjust enrichment, and indemnification claims, but only to the extent that they seek reimbursement for the funds EMC expended in defending HNI in the Underlying Litigation and other damages consequentially flowing from Mid-Con's possible breach of its duty to defend.


Date: August ___2___, 2012 in Denver, Colorado.



                                        BY THE COURT:


                                        ___s/Lewis T. Babcock_____
                                        LEWIS T. BABCOCK, JUDGE